APPOINTED, 1859.

S. NORRIS, *Clerk.*

JAMES P. O. LOWNSDALE *v.* THE CITY OF PORTLAND.

*U. S. District Court for the District of Oregon—In Equity
—Bill for Injunction—Amendment—Exceptions to Second
Amendment—Answer.*

AT CHAMBERS, JUNE 8, A. D. 1861.

1. A decree, at the suit of A., a private lot holder, in the town of Portland, against B., C. and D., declaring a certain strip of land to have been dedicated to the public, cannot be pleaded as an *estoppel*, in a suit by the grantee of B. against the municipal corporation of Portland, concerning a portion of the same premises. The municipal corporation and A. are not privies.

2. The decree pronounced by the Supreme Court of the late territory of Oregon, at the June term thereof, A. D. 1854, in the cause of Parish *v.* Lownsdale, Chapman and Coffin, was void; because neither party had any interest in the land in controversy.

3. That decree was not a decree *in rem,* but *in personam;* and although it is pleaded *twice* in the answer, its character is not thereby changed.

4. The act of Congress, August 14th, 1848, organizing the territory of Oregon, did not extend the act of 1844, commonly called the town-site law, over Oregon. The first act of Congress affecting the settlement and disposition

of the public lands in Oregon, was that of September 27, 1850, commonly called the donation law.

5. The provision in the act of August 14th, 1848, providing that the laws of the United States should be in force in Oregon Territory, "so far as the same, or any portion thereof, may be applicable," devolves upon the court, when the question arises, the power to determine what laws were "applicable," and what were not. In determining this question, the court is not bound by any construction that the executive department of the government may have given to such provision, in the discharge of *its* official duties.

6. A settler on the public lands in Oregon, prior to the 27th of September, 1850, held the mere possession under what was known as the "land law" of the "provisional government of Oregon." His control or interest ceased with his occupation, and when he abandoned or transferred the possession to another, that other took it as though it had never been occupied. The first one could not, by any act of his, charge the land in the hands of the second one with any easement or incumbrance whatever.

7. A dedication to public uses, by a release, upon condition that a pending suit concerning the premises shall be dismissed, does not take effect in case said suit is not dismissed. Such dedication by a release, without warranty or covenants, by a person who is a mere occupant, without any estate in the land, does not bind an after-acquired estate in the same land.

8. Where an answer is excepted to for impertinence, if the matter excepted to be in response to the bill, the exception will not be allowed, though the matter be impertinent.

DEADY, J. The complainant alleges that he is seized, in fee, of lots numbers one, two and three, in block number seventy-four, in the town of Portland, and that he has been so seized, and occupied the same, since the first day of January, 1853. That about the first day of July, 1860, he commenced to improve said lots, by the erection of wharves and wharf-houses. That he continued said improvements, without let or hindrance from said defendants, until about the time of filing his bill in this cause, to wit, November 9th, 1860, when the defendants threatened to destroy and remove the same, and did proceed to put said threats into execution, by arresting his agents and workmen engaged in erecting said improvements. That the defendants have no right, title, or interest in the premises, and that the proceedings and doings of the defendants impair the value of the premises, and are to the irreparable injury of complainant. That the complainant is a citizen of the State of Indiana.

Upon filing an amended bill, a temporary injunction was issued against the defendants, restraining them until the further order of the court.

The defendants have filed a second amended answer, to which complainant has filed amended exceptions, excepting to eight portions of said answer for impertinence. In considering these exceptions, I must treat this answer as a whole. Much of the matter to which the exceptions go might have been pleaded as pleas, but the defendants have chosen to avail themselves of the option given them by the rule of the Supreme Court of the United States, and pleaded them by way of answer. An answer being necessarily a whole, the attempt to plead certain parts of it separately, by calling them " counts in equity," does not change the effect. Indeed, I know of no such thing as " counts" in chancery pleadings. It is a phrase that belongs to common law pleadings, and even there applies only to the pleadings of the plaintiff. Wherever, then, matters alleged in one of the " counts" in the answer is contradicted by the allegations in another " count" or portion of the answer, I have, for the purpose of these exceptions, considered such allegation as untrue.

The answer denies the seizin, possession, and occupation of the complainant, and then " for further plea and answer," by way of what is called in said answer a " count in equity," pleads a decree of the Supreme Court of the territory of Oregon, pronounced at the June term of said court, 1854, in a suit in equity, wherein J. L. Parish was complainant, and Daniel H. Lownsdale, Stephen Coffin and W. W. Chapman were defendants. The said " count" recites from the pleadings in said suit, that in 1850 said Parish, having before that time purchased a block of lots fronting on Water-street, in said town, filed a bill in chancery, praying an injunction against said defendants, because said defendants were about erecting buildings on the strip of land adjoining the Willamette River, in front of said block, to the irreparable injury of said Parish. That Pettigrove and Lovejoy, former claimants of the town site, had, in laying out said town, dedicated

said strip of land to public use as a levee. That the defendants answered said bill, denying said dedication, and that upon the hearing, the court aforesaid found and decreed that the strip of land was so dedicated, and that the same was a part of Water-street, and perpetually enjoined the defendants from erecting obstructions on the same. The said count further alleges that the city of Portland had notice of said suit, that it was a party in interest, and employed McCabe to appear for them in court. That the complainant has no other title or interest in the premises than what he has derived from D. H. Lownsdale, and that the conveyance from D. H. L. to the complainant was long after the commencement of said suit, and that the premises in question are a part of said levee of Water-street, declared by said decree to have been dedicated to public use, and that, therefore, the complainant is estopped.

This "count," or portion of the answer, is excepted to as impertinent, because it appears that the decree therein pleaded was pronounced in a suit between different parties; and if that were otherwise, because it appears the decree is void, the court that gave it not having jurisdiction of the subject-matter, because, at the commencement of said suit, no law had been passed by Congress, whereby anybody could acquire any title to, or interest in, lands in Oregon.

On the contrary, the defendants insist that the decree is a valid subsisting decree, and that the present defendants are privies of Parish, and that, therefore, the decree is a bar to the relief sought by the complainant. The rule of law claimed by the defendants is admitted, that where a court of competent jurisdiction has determined a controversy, the parties to such suit, their privies in blood, law, and estate, are bound by it, and estopped from asserting in any court the contrary. The estoppel must be mutual and bind both parties. It is admitted that the complainant is a privy in estate with D. H. L., but denied that the present defendants are privies in estate with Parish. If privies at all, they are privies in estate. In support of the proposition that the defendants were par-

Lownsdale v. City of Portland.

ties to the suit by Parish, effect is sought to be given to the allegation of this " count," that they (the defendants) were parties in interest, and employed counsel to appear for them. If, by the words, *party in interest*, it is meant that the city was a party to the suit in the usual way known to the law, by being a party on the record, then the allegation is shown to be untrue by the answer itself, because it appears from that, that Parish was the sole complainant on the record. But if the words are used in the sense that the city had an interest in the question, by having a like claim to this or other property similarly situated, then they signify nothing, because to be interested in the question determined in a suit, in no way makes the city a party to it.

If, in a suit between A. and B., the question is, whether a conveyance from A. to B. of Blackacre, by a deed not acknowledged, passes the estate, and there should be one hundred other persons in the same State having conveyances to land similarly executed, they would all have an interest in the question, because the law, as determined in that case, is the rule for like cases; but no one would pretend, for that reason, that they were parties to the suit, or in any way estopped by the judgment of the court.

As to the employment of counsel by the city, the record shows that the counsel spoken of appeared for Parish, and not for the city. The fact is, I suppose, what often occurs, that the city, after its incorporation, thinking that it had an interest in the question, *or being so advised by the counsel*, contributed something to him to stimulate his efforts as the attorney of Parish. It is the same as if the hundred persons in the case I have supposed, who were similarly situated with B., had contributed money to employ counsel to argue B.'s case, and to procure a determination which, as a precedent, would be favorable to themselves. This would not make them parties to the suit. But there is a fact stated in the answer which makes it impossible that the city could have been a party to the suit, and that is, that the city was not incorporated until 1851, after the commencement of the suit.

A party to a suit must be either a natural person or a legal entity, as a corporation created .by law. The city of Portland had no existence before its corporation, and how could it be a party to a suit before it existed ; as well might an unborn child be called a party to a suit.

There may have been people living in the town of Portland at the commencement of the Parish suit, and, in the common parlance of lot speculators, they may have called the *place* a city ; but none of these persons, except Parish, were parties to that suit, and the municipal corporation since cre- ated, called by law the city of Portland, and which now represents the people, and is her defendant, did not exist. Neither is there any privity in estate between the defendants and Parish. They do not claim through him or under him. The suit of Parish proceeded on the ground of a private right in him to have the levee left open for the public to have free access to his, Parish's, premises ; and that if the defendants in that suit were allowed to obstruct the levee in front of his premises, and thus prevent the public from reach- ing his place of business, it was to him, Parish, a private in- jury, because it depreciated the value of his property. To my mind it is as plain as that two and two make four, that the city was not a party to the Parish suit, nor in any way a privy in estate with him. The city would not be estopped by this decree, and as all estopples must be mutual, neither can the complainant be.

As to the second question made by the complainant in sup- port of his exception, I do not think that I can take judicial notice that the case of *Parish* v. *Lownsdale et al.*, 21 *How. U. S. S. C. R.*, is the same cause that is pleaded in the an- swer. But the principle laid down in that case is applicable in like cases, and of binding authority in this court. The Supreme Court, in that case, dismissed the appeal, because the subject of the controversy, *as to the parties*, had no value. Why had it no value ? Because "neither party," in the lan- guage of the court, "had any title or interest in the land whatever." They had no interest in the land, because, says

the same authority, "Congress passed no law in anywise affecting title to lands in Oregon Territory till September 27th, 1850," and before that time this suit was commenced. Under this state of law and facts, had the territorial court jurisdiction of the subject-matter? To answer this question, it would seem to be enough to ask what *was* the subject-matter? It was the alleged interest of the parties in this land; but as neither had any interest in it, there was nothing in the power of the court to adjudicate. From these premises it necessarily follows, that the decree of the territorial court *is void*, and estops nobody. The exception to the first "count" must be allowed.

The answer then proceeds, in what it calls a second "count in equity," to plead the same decree, omitting the allegations in relation to the city being a party in interest, and having employed counsel.

It is difficult to understand the object of pleading the same decree twice in the same answer; but I believe the learned counsel for the defendant insists that this decree, as pleaded in this so-called second "count in equity," is, in some occult way, an adjudication *in rem*, and binds all the world. If such becomes the effect of this decree by simply pleading it twice, it might be a curious question in *legal alchemy* what would be the result of pleading it *thrice?* A judgment *in rem* is given in a proceeding in courts of Admiralty and the Court of Exchequer; the suit is against the thing, and called *in rem*, as a ship claimed as prize, or goods imported in violation of the revenue laws, and the judgment of the court is given directly against the *thing*, and determines its *status*, and all questions of ownership, or property depending thereon, from thenceforward. From the necessity of the case, for the convenience of commerce, to this judgment all the world are said to be parties, and are bound by it. During the pendency of the suit, any one may come into court, prefer a claim to the thing, or an interest in it, and be heard, and control the proceedings; and if any one having such a claim omits to do so, he is deemed to acquiesce in what takes place. But in a

criminal proceeding, at the suit of the king in the exchequer, against a person charged with unlawfully importing goods, although the question of unlawful importation is determined, the judgment of the court is not *in rem*, but *in personam*, against the unlawful importer, and is not conclusive against third persons, as to the ownership of the goods.

This decree, then, is in no sense a decree *in rem*. It was pronounced in a suit *in personam* against the person. This "count" is nothing but the first count repeated, with the omission of the allegations above referred to, and the exception to it must be allowed for the same reason.

The third exception is taken to so much of the answer as is called therein the fourth "count in equity." This portion of the answer alleges that, in 1845, a number of persons occupied the present site of Portland, and laid out a town thereon for the purposes of trade and commerce. That said persons, and others, the inhabitants of Portland, did, and always have, used said levee as a public easement, except certain portions of the same wrongfully appropriated and held by private persons. That the territory of Oregon was organized by act of Congress in 1848; by virtue of which act, the act of Congress of 1844, commonly called the town site law, was extended over Oregon. That in 1851 the town of Portland was incorporated, and that in 1852 the United States surveys were extended over the place. That in 1858 the city of Portland entered, at the proper land office, the present site of Portland, under the act of 1844. That in 1860 the city received a patent therefor from the United States for the purposes of the act of 1844. That complainant derives title from D. H. Lownsdale, and that the title of the latter is founded upon his entry of the 11th of March, 1852, under the donation law of 1850. That said lands were not subject to donation under the law of 1850. That said D. H. Lownsdale acquired no title by said entry, but that said lands were vested in the occupants, under the act of 1844. That the premises in question are within said city entry.

Counsel for the complainant insist that the matters stated in

Lownsdale *v.* City of Portland.

this "count" are no bar to the complainant's bill, because the act of 1844 was not in force in Oregon, and, consequently, the city took nothing by the entry and patent; but if said law was in force, then, in that case, the city is seized only as trustee "for the benefit of the occupants thereof, according to their respective interests." That the complainant is the occupant of the lots in question, and that his interest includes all the estate in said lots, except the naked legal title, held by the city as trustee for his benefit. For the defendants it is contended, that by the provision of the act of 1848, which " declared the laws of the United States extended over" and " in force in said territory so far as the same, or any provision thereof, may be applicable;" the act of 1844 was extended to this country, and the decision of the land office, and the issuance of the patent, are relied on as authority for such construction. That an occupant, under the law of 1844, in his right of selection as to the particular place he will occupy, is subordinate to, and must accommodate himself to the law of the community who constitute the occupants of the town. That such portions of the town as the community may designate as streets or public grounds, *for that reason becomes so,* and are not liable to individual occupation.

As to the question of the individual right of occupation, it is difficult to determine; and the difficulty is principally in the inadequacy of the law to the regulation of the subject. Where a number of persons, coming together fortuitously, settle down upon a piece of land, and a town gradually grows up around them, under the act of 1844, it is hard to find any authority for any portion of said occupants to constrain any less number of said occupants to occupy more or less of said ground, or in this or that place. I suppose the law, when originally passed, was a special and temporary measure, intended for some town already built up, and it adopted the state of things as to streets and lots that it found existing. But I do not think it necessary to determine this question, because the answer denies the seisin and occupation of the complainant, and, for the purposes of the present

proceeding, that denial must be considered true. It results that the complainant is not an occupant of the lots, and if the law of 1844 was in force in Oregon by virtue of the provisions of the act of 1848, then the complainant would be without interest in the premises.

This leads me to consider whether the law of 1844 was in force in Oregon prior to the time of its extension here, by special act of Congress, July 17, 1854. Its operation since that time could not, I conceive, affect the rights of the parties to this suit; because it appears, by the answer, that D. H. L. entered the land in question, under the donation law, as early as the 11th of March, 1852, and the question must be determined by the laws in force prior to the time of said entry.

When Congress, by the act of 1848, organizing the territory of Oregon, said that the laws of the United States should be in force in said territory, " *so far as the same, or any provision thereof, may be applicable,*" they did not mean that any particular law of the United States should be in force here, but only such as should be *determined* " to be applicable." Under this state of things, authority is necessarily given to the courts of the country, and it becomes their duty, whenever the question arises, to decide what laws were in force and what were not. Doubtless any administrative department of the government—the land-office, for instance—charged with the duty of disposing of the public lands in this territory, may be called upon to decide the same questions; but I respectfully submit, that while their decision may operate to pass the title out of the United States, it does not conclude the courts in a proper case, when parties are before the court, claiming under conflicting laws of the United States, or *any* law of the United States, from deciding what laws were *applicable*, and consequently in force, and what were not, at a particular time, independently of the decision of said department, or even adversely to it.

It is well known, that at the time of the organization of Oregon Territory, an anomalous state of things existed here.

Lownsdale *v.* City of Portland.

The country was extensively settled, and the people were living under an independent government, established by themselves. They were a community, in the full sense of the word, engaged in agriculture, trade, commerce and the mechanic arts; had built towns, opened and improved farms, established highways, passed revenue laws and collected taxes, made war and concluded peace. As a necessity of their condition, and the corner-stone of their government and social fabric, they had established a "land law," regulating the possession and occupation of the soil among themselves. That all this was well known to Congress, at the time of the passage of the act of 1848, would be highly probable from its historic importance, and is certain to have been so from the language of the act itself. (*See secs.* 14 *and* 17 *of the act of* 1848.)

The leading feature of the land law of the provisional government was that which provided that every male inhabitant of the country, over a certain age, should hold and possess 640 acres of land. The uses that the land might be put to were immaterial. The occupant might cultivate, pasture it; or, if he possessed a good site, and had the thrift and enterprise, he might build a town upon it. In the disposition of the public lands, this state of things called for peculiar legislation, differing *in toto* from that required in an unsettled country. Under these circumstances, is it to be presumed that the act of 1844—an obscure and special provision of the then existing land system of the United States—was extended over this country, and the general provisions of the same, contained in the pre-emption act of 1841, left behind? Nothing can be more unreasonable. It would tax the ingenuity of man to find a provision in the land system of the United States, as it stood in 1848, less applicable to the condition of the country, or that would have worked greater hardship, confusion and injustice, than the act of 1844. To the *thrifty and enterprising* settler it would have said: By your enterprise and industry in building up this town upon your claim, you have lost it. If you had merely erected a

seven-by-nine cabin on it, with a straggling "lean-to" attached, and pastured it with a few Spanish cattle and Cayuse ponies, it would have been yours.

The acts organizing the territories of New Mexico, Kansas and Nebraska, extended the laws of the United States over them in the same language that the act of 1848 did over Oregon; yet that was not deemed to have extended the act of 1844 over these territories. But Congress, by special enactment of 22d July, 1854, extended said law over those territories. If these words of the organic act extended the law of 1844 over them, why this special legislation for the same thing? By the act of 9th of September, 1850, California was admitted into the Union. The act declares, (section 3,) "that all the laws of the United States, *not locally inapplicable,* shall have the same force and effect, within the same State of California, as elsewhere in the United States." This never was supposed to have extended the law of 1844, or any portion of the land system of the United States, over that State; but, on the contrary, Congress, by special act of 3d of March, 1853, provided for the disposition of the unclaimed lands within that State, and extended the provisions of the act of 1844, by name, over the lands not "mineral," "*occupied* by towns and villages." But this question has been negatively determined by the Supreme Court of the United States, in the case of *Parish* v. *Lownsdale et al.,* 21 *How. S. C. Rep.* The court says, that on the 29th of July, 1850, when that suit was commenced, "Congress had passed no law in anywise affecting the title to lands in Oregon," nor did not, "till September 27, 1850"—referring to the donation law. The general expression includes the particular; and, in this case, the court must have considered whether the particular law of 1844 was in force or not; for the parties litigant before them were occupants of lots in the town of Portland, claiming an interest in them. Yet the court says, that no law had been passed by Congress in anywise affecting the title to lands in Oregon, before September 27, 1850; thus

negativing the proposition that the law of 1844 was extended here by the act of 1848.

But the passage of the donation law is further evidence that Congress did not deem the law of 1844 " applicable," and never intended to extend it here. This law is a wide departure from the law of 1841, commonly called the pre-emption law. It is a system complete in itself, and was admirably adapted to the condition of the people and country as it found them. It substantially gave to every settler in the country his land claim as he held it, without any reservation of lands fitted for the purposes of trade and commerce, or town sites whatever. It assumes to be, as it really was, the first regulation by Congress affecting the public lands in Oregon. It was a practical recognition and confirmation of the land law of the provisional government. This law is in direct conflict with the act of 1844, and puts the question beyond cavil or doubt, that the law of 1844 was not in force in Oregon until specially extended here. This subject is ably and intelligently examined in the case of *Martin* v. *T' Vault et al.*, decided in the Supreme Court of the late territory of Oregon, at the June term, 1854. This exception must be allowed.

The fourth exception is to a portion of what is called the fifth " count in equity." Said " count" alleges, that in 1845 Pettigrove and Lovejoy selected the present site of Portland, and caused it to be laid out as a town. That said P. and L. dedicated said levee to public use as far as was in their power. That the people of Portland accepted said dedication, and occupied said levee without let or hindrance up to the year 1849. That then said P. and L. sold their claim to said town to D. H. L. That said D. H. L. recognised said dedication, but does not state when or how. That the people of Portland have always enjoyed the free use of said levee, except where private individuals have wrongfully held the same. That said D. H. L. did dedicate said levee to public use, and has never paid any taxes on the same. That D. H. L. claims to have acquired title to said lands since said dedication.

That complainant derived his title from D. H. L. long after said dedication by D. H. L.

This exception is to so much of said so-called "count" as alleges the acts and doings of P. and L., and extends to the words "1849." This exception must be allowed. It is too plain for argument. P. and L. had no interest in the soil, never acquired any, and had nothing to dedicate. They simply held the naked possession of the land under the laws of the provisional government, according to the custom of the country at the time they gave up and abandoned the possession to D. H. L., who took it as though the foot of man had never been upon it, except as to the extent of its boundaries, or any personal liability he might take upon himself by special agreement with said P. and L. in relation to their past acts concerning it.

The remainder of this so-called "count" is also excepted to. The exception will be disallowed. It alleges a dedication, upon the part of D. H. L. directly, and by recognition of the one said to have been made by P. and L. If D. H. L. made a dedication of the premises to public use, or recognised and confirmed one made by others, it is binding upon him, and of course upon his grantee, the complainant, by reason of the privity of estate between them. What amounts to a dedication and what does not, and whether any dedication made or recognised by D. H. L., before the passage of the donation law, will bind him, are questions that will properly arise on the hearing.

The next exception is to what is called in the answer the sixth "count in equity." This "count" alleges, that on the 14th of August, 1850, D. H. L., Stephen Coffin and W. W. Chapman, released to the public certain lots in said levee, including the one in question; that the release was made upon certain conditions, one of which was, that the suit of *Parish* v. *Lownsdale et al.* should be dismissed; that the conditions upon which said release was made have been fulfilled, and the release accepted by the people. That the city has power, by the charter, to remove obstructions from the

levee. That complainant's title is derived from D. H. L. , long after the making and acceptance of said release.

In support of the exception it is urged by the complainant, that said release appearing to have been made before the 27th of September, 1850, D. H. L. at the time had no interest or estate in the soil, and that, being without warrant or covenants, it does not bind an after-acquired estate in the premises, and, if this be otherwise, the release never took effect, because the answer shows that the condition upon which it was given was never fulfilled ; that is, the dismissal of the suit of *Parish* v. *Lownsdale et al.*

Upon examination of the authorities, I find the decisions, without exception, concurring in the rule, that a conveyance by deed of bargain and sale, or release, without warranty or covenants, does not bind an after-acquired estate in the same lands, which, as to the grantor, was then contingent. That where said after-acquired estate is obtained by the grantor from any other source than the title released, or bargained and sold by him, he is not estopped by said deed or release from claiming the premises even against his own grantee. The release was made when D. H. L. had no interest in the soil. It passed nothing beyond the mere naked possession which he held under the laws of the provisional government. If D. H. L. afterwards acquired title from the United States, it does not enure to the benefit of the public on account of said release. Where a party has the equitable estate in lands, and conveys by bargain and sale, or release without warranty, if he afterwards acquire the legal estate, while he is not estopped by his deed from asserting said legal estate, yet equity will compel him to convey it to his grantee of the equitable estate.

Where there is a dedication to public uses, without deed, but by public acts and declarations, under similar circumstances, the rule seems to be, that the after-acquired legal estate attaches to the dedication as soon as acquired by operation of law. There can be no question, then, upon authority, but that this release does not bar the complainant, and,

Lownsdale *v.* City of Portland.

upon the showing of the answer, it would be against equity and good conscience that it should. For while it is true that this " count" avers that the conditions upon which the release was made were fulfilled elsewhere, the answer shows that this averment is not true. At the time the release was given it appears that the suit of Parish was pending. It involved the right of the public on the one hand, and Lownsdale, Coffin and Chapman on the other, to the levee. The terms of a compromise were agreed upon, by which the defendants were to release their claim to a portion of the levee to the public, the public relinquishing all claim to the remainder, and to *procure the dismissal of the pending suit.* Now, it appears from the answer that said suit never was dismissed; that it was prosecuted to final decree against the defendants, and the decree is now pleaded in this same answer as an estoppel. For the defendants to claim any thing under this release, under those circumstances, ought not to be allowed. It would be a fraud upon the releasors. This exception must be allowed.

There are two other exceptions, one to the separate answer of Recorder Risley, and the other to the separate answer of Marshall Lappeus. They are disallowed. They may be impertinent, but being called for by the amended bill is a sufficient answer to the exception for impertinence. The order will be, that the first, second, third and fourth, and sixth sections be allowed; and that the fifth, seventh and eighth be disallowed.

*Williams*, for complainant.

*Cartter*, for defendant.