Argued February 26, affirmed March 23, 1915.

## LANG v. PORTLAND.

(147 Pac. 378.)

**Dedication—Designation in Map—Markets.**

1. The filing of a map or plat showing a lot marked 132, and declaring that: "Blocks having other marks are unappropriated, but left subject to the uses as follows: When they will be substantially improved for the following purposes: * * Blocks 132 and 172 for markets"—did not constitute a dedication of block 132 to the uses of a public market.

> [As to dedication by maps and plats, see note in 10 Am. St. Rep. 189.]

**Dedication—Designation in Map.**

2. Proprietors of a claim entered into an escrow agreement that each would acquire title to the part set off to him, and thereafter protect by proper conveyances those who had already purchased from

them. One proprietor undertook to procure title to the entire tract, and filed a map or plat stating: "Blocks having other marks are unappropriated, but left subject to the uses as follows: * * Blocks 132 and 172 for markets"—but never acquired title to such land. Another proprietor secured a patent for a donation land claim embracing block 132, and conveyed without knowledge of such map, but with reference to another map, and exercised private ownership over the block, brought ejectment against a trespasser, opposed ejectment by the city, and compromised by a sale to the city. *Held,* that there was no knowledge or acts on the part of the last proprietor committing him to any dedication made by the map of his coproprietor.

From Multnomah: GEORGE N. DAVIS, Judge.

Department 2.    Statement by MR. JUSTICE BENSON.

This is a suit by Gordon Lang and others to enjoin the City of Portland from using block No. 132 in said city as a site for the erection of a public auditorium. In the complaint it is alleged that the original owners of the town site, Stephen Coffin, Daniel H. Lownsdale and W. W. Chapman, in 1850 attempted to, and did, dedicate this block to the public for the uses and purposes of a public market; that plaintiffs are taxpayers and property owners in the vicinity of block No. 132, and will suffer special injury by a diversion of the use of this land from that of a public market to that of a public auditorium. It is also alleged, as a second cause of suit, that the charter of the defendant city authorizes the sale of municipal bonds to the extent of $600,000 and no more, for the acquisition of land for a site, "and for the construction, maintenance, operation and management of said public auditorium." It is then alleged that the sale of such bonds will produce a net fund of $528,000 for such purposes; that block No. 132 has a market value of $130,000; and that to appropriate this land as a site for the auditorium will involve an expenditure of $730,000, thereby exceeding the limit of expenditure authorized.

The defendants in their answer, by way of denials and affirmative allegations, join issue upon all of the

material allegations of the complaint, and, a reply
thereto having been duly filed, a trial was had, where-
upon the trial court made and entered a decree in favor
of defendants, from which decree plaintiffs appeal.

AFFIRMED.

For appellants there was a brief over the name of
*Messrs. Hall & Lepper,* with an oral argument by *Mr.
L. M. Lepper.*

For respondent there was a brief over the names of
*Mr. Walter P. La Roche,* City Attorney, *Mr. Stanley
Myers* and *Mr. Lyman E. Latourette,* with an oral
argument by *Mr. Latourette.*

MR. JUSTICE BENSON delivered the opinion of the
court.

The pleadings of this case deal largely in historical
recitals, in which there is, fortunately, but slight, if
any, divergence. Since these historical facts are of
large importance in determining the issues herein, it
will be well to state briefly such as we deem of value in
elucidating the questions involved.

In 1849 D. H. Lownsdale purchased of one Petty-
grove his claim to 640 acres of land on the west side of
the Willamette River where the City of Portland now
stands. He then sold to Stephen Coffin and W. W.
Chapman each an undivided one-third interest therein.
In the spring of 1850 these proprietors had the claim
surveyed by R. V. Short, who laid out a portion of the
property into blocks, and made a map thereof. John
Brady then made two copies of this map, thus afford-
ing each proprietor a copy. This map has since been
known as the "Brady map" or "Short-Brady map."
The plat included block No. 132, but bore no reference

or particular marking with relation thereto. In March, 1852, the three proprietors decided that the only satisfactory plan for securing a legal title to their land would be to secure patents under the Oregon Donation Act, and they therefore partitioned their claim, and entered into what was thereafter known as the ''escrow agreement,'' whereby they stipulated that each should acquire title to the part set off to him, that they would, after securing title, protect by proper conveyances those who had already purchased from them and protect each other from the complications arising from the claims of their several wives to portions of such donation claims. Thereafter Coffin and Chapman each took the necessary steps to secure title to the lands set off to him, but Lownsdale, for some unexplained reason, undertook to acquire title to the entire tract, and, having taken the required steps in that direction, on December 9, 1852, he filed for record a map with acknowledgment and memoranda attached thereto, which reads as follows:

''Plat of D. H. Lownsdale's claim, including map or plat of the original town of Portland (on what is known as the Portland claim of land, which claim is held under record, in the territorial record books in the name of Daniel H. Lownsdale; recorded on the 23d day of September, A. D. 1848, at Oregon City by Theophilus McGruder, recorder, and proven up before the surveyor general of Oregon at Oregon City on the 28th of October, 1852, by the said claimant, Daniel H. Lownsdale) together with enlargements. Now, know ye that so much of said claim as is covered with said original town plat or map and the enlargements are included within the marginal lines and the northern claim line and the river Willamette, inclusive, may and by my permission be subject to the by-laws of a corporation for said town or city under charter from the legislature of Oregon Territory so far as making regu-

lations for the public streets as laid down by their particular width (but not further), also any public square for ornamental purposes (but not otherwise), also any public parks. The several public streets are particularly marked with their names and widths. Those running eastward and westward commence at low-tide water mark at the margin of the Willamette River (except south of Market Street), and are all 60 feet in width, and no more. The wharves and wharfing privileges are all specially reserved to the holder of the claims, and never (except by deed) subject to any but the laws of the territory of Oregon or ordinances of town or city corporation as other town (private) property. The marginal above referred to are marked (A, B, C, D, E, G, H, I, J, K, on or not far from center of each line). N. B. All rights as claim holder and not particularly described above or quitclaimed to others to private individuals are specially reserved to me and my heirs forever. Given under my hand and seal this 3d day of December, A. D. 1852.     DANIEL H. LOWNSDALE.     [L. S.]

"Blocks 54 and 55 appropriated for public square. C. Church appropriated to the Congregational Church No. 23, North half B. Church appropriated to the Baptist Church No. 62 North half F. Seminary appropriated to Female Seminary No. 205. Blocks having other marks are unappropriated, but left subject to the uses as follows: At any time they will be substantially improved for the following purposes: B. 150 Free Masons, Odd Fellows, Sons of Temperance and Lyceum; block 132 and 172 for markets; North half block 134 district school; block 211 for Male Seminary; South half block 208 for Daughters Temperance. The parks of 80 feet in width are already appropriated for public parks.

"Received for record December 9th. Recorded December 16th, A. D. 1852.     W. S. CALDWELL,
"Clerk and Recorder."

Some time after the making of the Brady map, but prior to 1854, a map of the City of Portland was made

by T. O. Travailliot, the captain of a French ship then at Portland, and in 1866 a map was made by one Burrage, which, by order of the city council, was filed with the county clerk. These are the maps which are discussed by counsel in their arguments herein, although the Travailliot map is not in evidence, but is mentioned in the stipulation of facts, and it is admitted that block No. 132 is tinted with ''a reddish color'' therein. A patent, under the town-site act of 1844, was issued by the federal government to the City of Portland on December 4, 1860, and on March 8, 1861, a patent was issued to W. W. Chapman for a donation land claim, both of which include the land known as block No. 132. In 1852 the city council by resolution adopted the Brady map as the official plat of the city, and appointed a committee to secure bonds or deeds of the streets and deed of trust for the lands dedicated by the proprietors for public purposes, but the committee failed to secure the same. Prior to June 16, 1864, an action in ejectment was begun by W. W. Chapman against T. J. Carter for the possession of block No. 132, in which Chapman was successful. In 1865 the City of Portland began an action in ejectment against Chapman, in which case Chapman filed an answer setting up title, possession, and right of possession in himself, and, while this action was pending, the city council settled the controversy by paying Chapman $1,200, and receiving therefor a warranty deed to the land in dispute. In that action the city based its right of possession upon the patent issued to it under the town-site act of 1844.

It is conceded that W. W. Chapman, the patentee of the land in controversy, sold lots and blocks as represented upon the Brady map, but there is no satisfactory evidence that he ever knew of, or used, the Lowns-

dale plat in any manner.   The evidence discloses that the property has never been used as a public market. For several years it was used by L. G. Pfunder for his business as a gardiner and florist, and under his agreement with the city he improved and cultivated it with a view to its becoming a public park.   Thereafter, with the consent and approval of the city authorities, it served as a site for a Mechanics' Fair Pavilion, which building was so used for about 10 years, after which it was occupied by various people for various purposes, until 1903, at which time the city, by ordinance, leased the ground to a corporation known as the Union Market Company for a term of 25 years, upon the condition that they erect thereon buildings of a specified value, "to be used exclusively as a market place." This corporation assigned its lease and franchise to "the People's Market Association," a corporation, which having defaulted in the matter of complying with the terms of the lease, the city council sought to repeal the ordinance, and the corporation began a suit to enjoin the city from so doing.   Thereafter such proceedings were had therein that the city prevailed, and the suit was dismissed.   Since that time the land has been used as a place for storing firewood and for balloon ascensions, when it was not entirely idle.   There were many other lines of evidence developed upon the trial, but these are the only ones which we regard as pertinent or important in the consideration of the case.

1. The one important question to be determined is this: Does the city hold the title to the property by a dedication which would preclude its use for any other purpose than that of a public market, or does it hold the same by purchase from W. W. Chapman, free from any condition or limitation as to its use?

It is contended that whatever acts of dedication there were had their inception in the act of D. H. Lownsdale in filing the plat or map herein referred to, and were made binding, if at all, by the acts of Chapman, the first private owner of the fee, in selling property by the use and exhibition of that map or some copy thereof. It must be premised that Lownsdale never had any legal title to block No. 132, and that his act of filing the map referred to was done without the consent or approval of his associates. However, we are of the opinion that there is nothing upon or connected with the Lownsdale map in the nature of a dedication. The block No. 132 is platted thereon in like manner as other blocks, and there is no legend or statement except the one unsigned, which reads as follows:

"Blocks having other marks are unappropriated but left subject to the uses as follows: At any time they will be substantially improved for the following purposes: B. 150 Free Masons, Odd Fellows, Sons of Temperance and Lyceum; block 132 and 172 for markets," etc.

There is nothing in this statement inconsistent with private ownership. In a similar case the Supreme Court of Iowa says:

"The phrase 'Garden Square' does not express or necessarily imply a dedication to the public. The implication from the expression is rather the other way. There seems, however, to be nothing conclusive either for or against the dedication in the words used": *City of Pella* v. *Scholte,* 24 Iowa, 288 (95 Am. Dec. 729).

The same has been the holding as to a "hotel site" (*Hanes* v. *Land Co.,* 129 N. C. 311 (40 S. E. 114), and "wharf": *Palen* v. *Ocean City,* 64 N. J. Law, 669 (46 Atl. 774). And in the case of *Harris* v. *City of St. Helens,* 72 Or. 377 (143 Pac. 941), this court held that the plat of a town site upon which a tract of land is

designated as "the Strand," which designation is followed by the words "reserved for wharves," does not imply a dedication. The court, speaking by Mr. Justice RAMSEY, says:

"The phrase 'reserved for wharves,' written in that part of said plat marked 'Strand,' signifies that the owner retained or kept back the tract represented by that space for wharves. Wharves may be private property; and hence the words 'reserved for wharves' do not manifest an intention on the part of the owner to part with the title to the Strand or to devote it to public use. He may have intended to retain it until it should be needed for wharves, and then sell it to persons desiring to engage in the business of operating wharves. There is nothing in the words used to indicate that he intended to devote said property to the public use as a place for wharves. The use of the word 'reserved' tends to negative such an intention."

This very clear and accurate expression of the law is strikingly pertinent to this discussion. It will be remembered that the Lownsdale plat, referring, among others, to block No. 132, says:

"Unappropriated, but left subject to the uses as follows: When they will be substantially improved for the following purposes: * * Blocks 132 and 172 for markets."

Every market in Portland to-day is private property. The above statement, as it impresses us, seems to negative any intention to devote to a public use; but, if it were otherwise, if the statement upon the Lownsdale map did constitute a dedication to the public use as to Lownsdale, there is no persuasive evidence in the record tending to connect Chapman therewith.

2. Chapman says that he never saw the Lownsdale map; that he sold his lots and blocks by the use of the

Short or Brady map, which was absolutely silent as to any public use of block No. 132. The record also discloses that he exercised acts of private ownership over the premises, such as cutting down the forest trees thereon, bringing an action in ejectment against one Carter as a trespasser, contesting the ejectment action of the city against himself, and compromising that proceeding by selling the property to the city for $1,200. It was contended by plaintiff that the "escrow agreement" entered into by Lownsdale, Coffin and Chapman committed Chapman to the alleged dedication in the Lownsdale map, but, after a careful reading and consideration of that document, we are unable to find anything therein to justify counsel's contention. It must not be forgotten that Lownsdale never had any title to the land in controversy. In the case of *Lownsdale* v. *City of Portland,* 1 Or. 394, Fed. Cas. No. 8578, Judge DEADY, in speaking of Lowndale's interest as acquired from Pettygrove and Lovejoy of the same lands and others, says:

"Pettygrove and Lovejoy had no interest in the soil, never aquired any, and had nothing to dedicate. They simply held the naked possession of the land under the laws of the provisional government, according to the custom of the country at the time they gave up and abandoned the possession to D. H. Lownsdale, who took it as though the foot of man had never been upon it, except as to the extent of its boundaries, or personal liability he might take upon himself by special agreement with said Pettygrove and Lovejoy in relation to their past acts concerning it."

This quotation is quite relevant in the case at bar, in speaking of the dealings of Lownsdale and Chapman, in relation to block No. 132. Neither party contends that the city had any title to this land by virtue of the town-site patent. It follows that Chapman

never dedicated these premises to a public use, and the city acquired title by purchase from Chapman, free from any trust or limitation as to its use.

As to the threatened acts of the city in expending a greater sum for an auditorium than the amount limited by the vote of her citizens for that purpose, it is needless to say more than that the evidence discloses no purpose upon the part of the authorities to do so. There are a number of contentions presented by counsel which we have not discussed, but views herein expressed render their consideration unimportant.

The decree of the lower court is affirmed.

AFFIRMED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BEAN and MR. JUSTICE HARRIS concur.