THE CITY OF PELLA v. SCHOLTE.

1. Dedication: GARDEN SQUARE. The words "garden square," marked on a square in a town plat, do not necessarily imply a dedication of it to the public. The words are equivocal, and resort must be had to extraneous circumstances to discover what was intended by their

use. The circumstances which were in this case held insufficient to establish a dedication to the public of a square thus marked on a town plat, enumerated and discussed by DILLON, Chief Justice.

2. Limitation, statute of: CORPORATION MUNICIPAL. While the statute of limitations will not run against the State or sovereignty, it may against a municipal corporation. It was accordingly *held*, where the original proprietor of a town held open and visible possession of a square therein for the statutory period for the limitation of real actions, claiming that he had never relinquished, but still retained title thereto, that the right of the corporation to maintain an action for the recovery thereof was barred.

3. ——— FORCIBLE ENTRY. *Semble*, that the operation of the statute of limitation cannot be suspended by a forcible entry, and that the statute will continue to run notwithstanding such entry, when not followed by continuous possession. *Aliter*, if the possession was peaceably obtained and continuous.

4. ——— DEFORCEMENT. Where the possession of one was originally lawful, and he afterward refuses to surrender it to another subsequently acquiring the right of property, this amounts to a deforcement within the common law meaning of the term, and a mere entry by force would not, in such case, even at common law, suspend the operation of the statute.

5. ——— APPLICATION OF PRINCIPLE. S., the original proprietor of the town of P., continued in the actual possession of a square therein, marked on the plat as "Garden square." P. was subsequently incorporated as a city, the authorities of which claimed the square as having been dedicated to public use, and entered thereon in a forcible manner before the statute of limitation for the commencement of an action for its recovery had run; thereupon S. obtained an injunction against the city, enjoining it from disturbing him in his possession. *Held*, that the entry was not equivalent to the bringing of an action, and did not prevent the bar of the statute.

*Appeal from Marion District Court.*

WEDNESDAY, APRIL 15.

DEDICATION: "GARDEN SQUARE": STATUTE OF LIMITA-TIONS. Petition in equity filed in February, 1866, by the city of Pella, in its corporate capacity, claiming against the defendants (the original proprietors of Pella, and who

laid out the same), that a certain block of ground, designated on the plat of that place as "Garden square," was dedicated to the public; that the defendants, H. P. Scholte, and his wife (his voluntary grantee), deny the public right and obstruct the public enjoyment of the square. The city prays to have its right to the control of the square judicially established.

This cause was previously before this court on a demurrer to the petition (21 Iowa, 463). The special nature of the averments of the petition will be seen by reference to the report of the case on that appeal. When the cause was remanded, defendants answered, denying the alleged dedication of "Garden square" to public use, and setting up the statute of limitations — averring eighteen years' quiet, uninterrupted use and enjoyment of the square, as their private property.

Upon the issues thus made, a large amount of testimony was taken by the parties.

From the decree of the District Court dismissing the petition, the plaintiff appeals.

*Seevers & Williams* for the appellant.

*H. P. Scholte* and *Z. T. Fisher* for the appellees.

DILLON, Ch. J. — This appeal presents two leading questions:

1. Was the block of ground marked on the recorded plat of Pella "Garden square" dedicated by the defendant, Scholte, to the public?

2. If so, is the plaintiff's right barred by the statute of limitation?

With reference to both of these qestions it is urged that the circumstances relating to the founding and laying out of Pella are important as evincive of the intention of Mr.

Scholte in platting the square in controversy, and as illustrative of his subsequent possession and control of it.

A brief allusion to these circumstances is, therefore, needful. Pella was originally settled by emigrants, coming thither in a body or colony from Holland. This body or community was organized in the Netherlands. At Utrecht, in that kingdom, on the 25th day of December, 1846, the society took definite shape, and adopted on that day, written "Regulations for emigration to the United States of America." These are in the nature of a constitution for the body, and clearly indicate the purpose of the organization. It was to be composed of persons desirous of coming to the United States. It was largely religious in its origin. Conspicuously displayed in publications by the defendant, Scholte, and in maps of the place, is the motto: " *In deo spes nostra et refugium.*"

Immoral persons were not allowed to become members. Recollecting the eighty years religious struggle between the fatherland and Spain — a struggle made memorable by the transcendent abilities of William the Silent, and the exhaustless patriotism and fortitude of the people; by the despotism of Charles V.; by the unyielding obstinacy of Philip II.; by the almost unexampled cruelties of Alva; by the great disparity of resources in the contending parties; by the memorable example it gives that no movement is so deep as that which proceeds from the religious nature of man, and of the wonderful power of a people animated by the sublime instinct of preserving at once country and religion — recollecting this national epic, but as yet not sufficiently familiar with the great truth (so well-known to the people of the land to which they proposed to go), that religious concord is the child only of universal and undiscriminating religious freedom, they provided in terms that no Roman Catholic should

become a member of the society. The object was not to form a communist organization. The "Regulations" clearly show this. The society was to be governed by a board, consisting of the president, vice-president, secretary and four counsellors.

Each member was to bear his own expenses and to pay for his own land. The board was to make contracts for and superintend the passage. Money to buy the amount of land each desired was to be paid to the board, and, when the place for the settlement was selected and the land purchased, the latter was to be divided, each to get the amount for which he paid.

In a central position one hundred and sixty acres were to be retained for school purposes, with provision that smaller parcels might be sold to artisans and tradesmen, that is, to those not wishing to engage in farming. Births and marriages were to be registered. The president was the chief executive officer. He was to sign all documents, and all proceedings of the society were to be recorded.

The defendant, Scholte, was the president. In 1847, Marion county, in this State, was selected as the place of settlement. And in the same year, a survey was made of eight blocks of a town called Pella. This was located upon land purchased by the defendant. The legal title was in him. There is no evidence, at least no sufficient evidence in this record, showing that the defendant held the title to this land in trust for the community. And it may here be observed, that it is uncertain, from the evidence before us, how long or to what extent the "Regulations" were applied to the affairs of the community. It does appear that the defendant sold and conveyed the lots, and received the money, and it does not appear that his indivdual right to the lots or the proceeds thereof was ever questioned.

It must be taken then, that the defendant was the individual proprietor of the land on which Pella was laid off, and of the lots after it was platted.

And here we notice some of the more material circumstances relied on by the plaintiff to establish the dedica1. DEDICATION: tion. It is claimed, that, in the Holland lan-
garden square. guage, " garden square" means a public square. It is not satisfactorily shown, that either the word " garden," or the word "square," has any peculiar meaning in the Dutch language.

The phrase " garden square" does not express or necessarily imply a dedication to the public. The implication from the expression is rather the other way. There seems, however, to be nothing conclusive either for or against the dedication, in the words used. The words are equivocal. Resort must be had to extraneous circumstances to discover what was intended by this language. And here it may be observed, that the public claim the property on the ground that the original owner has given it for public use. The onus is on the public to show that the owner has thus given it.

It has been stated above, that, in 1847, a survey of eight blocks was made. It is claimed by the city, that in the center of these eight blocks was a piece of ground, the same as that now known as " Garden square," which was marked on the plat, made by the surveyor Hall, as " Public square." Defendant denies that Hall made any plat, and claims that his survey was only preliminary, in order to ascertain about where the streets would run when a final survey came to be made, so that some necessary improvements could be made.

During the next year (1848) the second survey was made by another surveyor, and there was laid off and platted eighty-seven blocks. The plat was duly acknowledged by Scholte, and recorded. Across the block in

controversy are the words "Garden square," and the block is numbered twenty-six.

There are also on the plat two blocks called respectively "East Market square" and "West Market square." None of these are subdivided into lots. The two market squares have always been recognized as belonging to the public. Immediately north of the block marked "Garden square" is block seventeen, in size equal to two blocks. This, also, is not subdivided into lots nor intersected by the East and West street. This double block, it is clearly shown, was laid out in this shape by the defendant, as the site of his future residence, and is the one on which he soon thereafter built and now resides. The testimony also tends to show, that this block seventeen was, in the survey of 1847, two distinct blocks with street between. Upon the whole, we think the weight of testimony is, that there was a plat made of the Hall survey of 1847. But this survey was not intended to be, and was not final. If a plat was made, it was never acknowledged or recorded. Nor does it appear, that any conveyances were made under it, though a few lots were sold, but conveyed according to the final survey made in 1848.

If reliance can be placed on the unassisted memory of a majority of the witnesses testifying to this point, we would have to conclude, that the block of ground in controversy was, in the first survey, marked "Public square." But the fact is by no means clear that there was a plat, and particularly, that it contained the words "Public square."

Defendant claims, that, as the ground lay in front of the site of his future residence, he caused the same to be marked "Garden square," to indicate a place in the nature of a private park, which he intended to ornament with trees, shrubbery, walks, etc., for his own pleasure

and convenience, denying or allowing the public access thereto, and such rights therein, as he might see proper. And, it must be admitted, that, from the beginning, the defendant's acts and conduct, with respect to this ground, in fencing, planting and improving it at his own expense, go very far to fortify this claim. That the defendant recognized a difference in meaning between "public square" and "garden square" is shown by the fact, that, in, laying out New Amsterdam, at the same time Pella was laid out, defendant caused one of the blocks to be marked "Public square."

Other facts are relied on by the plaintiff to establish the alleged dedication.

One is, that the defendant, as an inducement to persons to buy lots, declared to them that "Garden square" belonged to the public.

Only one or two persons testify to such declarations, and, when it is remembered that the testimony relates to oral declarations made many years before; that such declarations are denied on oath by the defendant; that it is shown that the defendant, at or about the same time, frequently denied that it was public property, we cannot say that the imputed declarations of the defendant that the square was public are satisfactorily established.

It does very clearly appear, that a higher price was asked for lots around the square than in other portions of the plat.

If it be admitted that this is not satisfactorily accounted for by the central situation of the lots; by the fact that the defendant, by his theory, intended to ornament the square, still it is only a circumstance, but not a conclusive one, to prove the alleged dedication.

Without going more minutely into the discussion of this branch of the case we may state our general conclusion to be this: If this dispute had arisen shortly

The City of Pella v. Scholte.

after the platting and declarations relied on to show the dedication, we are of opinion that the same evidence now before us would justify us in holding that the defendant had ceded his right to the public, or at least was estopped to set it up against the vendee of the lots around it.

But as this dispute arises after the lapse of about eighteen years from the period of the supposed dedication, during all of which time the defendant's acts and conduct have been wholly inconsistent with a dedication to public use, we must say that we have great doubt whether the plaintiff has satisfactorily shown that the defendant, in platting the square, intended to dedicate it, or, that, by his subsequent acts and declarations, he is estopped to deny a dedication.

At the time of the supposed dedication (1847 and 1848), the defendant resided with his family, in a log house, upon the square in question. He continued to reside there until his new house was finished upon the double block just north of it. After he left the house on the square, he rented it to others for some years, and as long as it continued to stand. A portion of the time a school was kept there, and occasionally public meetings were held in it and on the square, but this was generally, if not always, by the special and express permission of the defendant. Besides this, the defendant has had the square fenced all the time; at first by a rail fence, and afterward by a paling fence of a substantial character, constructed at his own expense. In this fence there were two gates, in general kept locked by the defendant. Defendant also made, from time to time, plantations of trees in and around the square, and also laid out walks therein.

For some years he cultivated the ground for ordinary horticultural purposes, and afterward seeded it to grass

The City of Pella v. Scholte.

and used it as a pasture, and let it to others for this purpose for hire.

Again, defendant has returned the same for taxation as private property every year since 1847, and every year has paid the county and State taxes thereon.   The city of Pella was incorporated August 3, 1855.   Every year since then, the defendant has returned it to the city assessors, among his other property, for municipal taxation.   Every year but one, the council has stricken it off as not being taxable.   One year, it seems, the defendant did pay city taxes on it.

So it is evident that the city authorities have known from the first that the defendant asserted his claim to the square and denied that of the city.   And so it is manifest from the evidence, indeed the fact is scarcely denied, that, since 1847, the defendant has been in the actual possession and exercised the sole control of the square, claiming to do so in his own right, and in hostility to the public.

To evade the significant force of this undeniable fact, the city claims that this possession and control by the defendant was not in his own right, but as the president of the emigrant association, before referred to.

This is open to two answers :

The evidence in the record does not satisfy us (as before stated) that the association had any right in or to the ·square, the town lots or land on which these were laid out ; hence, it cannot be predicated of defendant's possession, that it was as the trustee of the society.

Again, if it were conceded that the defendant's possession was that of the society (a voluntary association) so that it is to be considered as if the society were in the possession and control of the square, it is not shown how the city corporation succeeded, in this respect, to the rights of the members of the society.   Of course, if the

square were once dedicated to the public, the subsequently organized municipal corporation would have the right to control it the same as it would the streets or other public ground.

Under these circumstances the question recurs whether (assuming that there had been a dedication of the square in 1847 or 1848) the defendant may insist upon the bar of the statute of limitations. It will be assumed that the statute would not begin to run in favor of the defendant until the town or city was incorporated, charged with the duty of watching, and possessed of the power of asserting and protecting the rights of the intended donee. The city was organized August 5, 1855. This suit, to assert the right of the city to the square, was not brought until February 26, 1866, more than ten years after the incorporation of the plaintiff. To actions of this character, though brought in equity, the ten years' limitation applies directly or by analogy. This is not disputed by counsel. Rev. § 2740; *Keyes* v. *Tait*, 19 Iowa, 123; 3 Kent Com. 575, 576; Adams' Eject. (Appendix) 4 ed. 601, and authorities cited; *Newman* v. *De Lorimer*, 19 Iowa, 244; *Johnson* v. *Hopkins*, id. 49; *Robinson* v. *Lake*, 14 id. 421.

*2. Limitation, statute of: corporation, municipal.*

Rights of this character may be acquired by the public by the requisite user. *Onstott* v. *Murray*, 22 Iowa, 457.

And it would seem reasonable that the public, with knowledge of its rights and of the adverse claim by an individual, may lose those rights in a similar manner.

Of course it is well understood that statutes of limitations do not constructively apply to the State or sovereignty. But the principle has not, so far as we know, been extended to municipal or public corporations. On the contrary, it has been expressly held, that these corporations are within the statute of limitations the same as natural persons. *Cincinnati* v. *The Church*, 8 Ohio, 298,

1838, followed in *Same* v. *Evans*, 5 Ohio St. 594, 1855. See also *Rowan* v. *Portland*, 8 B. Mon. 250, 258; *North Hempstead* v. *Hempstead*, 2 Wend. 109, 137; *Denton* v. *Jackson*, 2 Johns. Ch. 320, 338.

Whether there may not be some limitations on this general doctrine, arising out of the want of knowledge of the public corporation or its officers of its rights, or of the adverse right sought to be asserted against it, we need not stop to examine. For in this case, the right claimed by the defendant has been openly asserted by him, and fully known to the city ever since its first organization.

The present case is, therefore, a proper one for the application of the statute, or the principle of repose upon which it rests. This leaves but one question to be noticed with reference to the application of the statute.

Defendant, as before stated, was in the open and visible possession of the square, claiming title to it at the time the city was incorporated. He continued in such possession, without any interruption, until the 31st day of March, 1865 (slightly less than ten years from the date of the plaintiff's corporate organization), when the city of Pella passed an ordinance "concerning the Garden square," directing the marshal of the city "to take immediate possession of the square," "to remove such portion of the fence and hedge around said square, and to train, cut down or destroy such trees thereon, as the mayor might direct." The marshal proceeded to execute the ordinance, whereupon the present defendants (Scholte and wife) brought their bill to enjoin the officer, and obtained an injunction, and at once resumed possession. Thus the defendant, with the exception of the forcible interruption by the marshal for a few days, continued to remain in possession until this suit was brought by the city, in February, 1866.

It is claimed, that the statute ceased to run when the

marshal of the city undertook to execute the ordinance of March 31, 1865. It seems to us, that the proposition is not well founded. The marshal's possession was forcible and against the will of the defendant, in actual possession.

Suppose I am in actual possession of a lot claiming title, and that the adverse claimant shall come every day and deny my right or temporarily but tortiously dispossess me by force, but still I retain my possession for the ten years required by statute, will not the statute operate in my favor, if in the meantime no "action be brought?" Under our statute (§ 2740), which speaks of actions, and not of actions or entries, it seems clear, that it will; and this view, applied to this case, disposes, against the plaintiff, of the point now under consideration. See 2 Greenl. Ev. § 545; *Hubert* v. *Trinity Church*, 24 Wend. 587; *Cunningham* v. *Patten*, 6 Barr, 355; *Doe* v. *Eslava*, 11 Ala. 1028.

It is proper, however, to add, that, in our opinion, the evidence shows no such "interruption" of the adverse possession of the defendant by the forcible act of the marshal, in removing the fence and cutting down some trees, as will suspend the operation of the statute.

If the defendant had abandoned the possession, or if the entry by the city had been peaceable, or if it had been followed up by continuous possession, a different question would be presented. But the entry was forcible, upon the actual prior possession of the defendant, who disputed the city's right, obtained at once an injunction against the city disturbing him in the possession, which he immediately resumed. Such an entry, if the act of the marshal amounts to an entry, will not avail to defeat the defense of adversary possession.

At common law, and under the statute of 21 Jac. 1, ch. 16, the rightful owner of land might, in certain cases

of ouster or privation, redress the injury or avoid the
effect of the statute of limitations, by the "exercise of
the extra judicial and summary remedy of a formal and
peaceable entry" thereon. In certain cases, however,
the common law did not allow the right of the possessor
to be interrupted or defeated by the mere act of entry
by the claimant, but drove the claimant to his action.
The cases in which entry is, and in which it is not,
allowed, are stated by Blackstone, 3 Com. 167–179; see
also *Altemas* v. *Campbell*, 9 Watts, 28; *Lessee of Holtz-
apple* v. *Phillibauer*, 4 Wash. C. C. 357.

In this State we have now no statute relating to or
4. —— deforce-  regulating the right of entry. See formerly,
ment.       Laws of 1839, p. 326, §§ 6 and 7.

Whether a mere entry by the owner not followed by
possession upon the actual possession of the adverse
claimant would have, in this State, its common law prop-
erties, and would, from the time of such entry, defeat
the statute of limitations, we need not stop particularly
to inquire.

For, assuming the common law to apply, the possession
of Scholte of the square in question was originally law-
ful, he being in actual possession as owner when he laid
it out; and, as against the city, his possession became
wrongful only when the city was organized, and he
refused to surrender the possession to the city, which
would amount to, or be in the nature of, a *deforcement*
in the common law meaning of the word. In such case
the remedy by mere entry alone was not given by the
common law. 3 Black. Com. 167–179.

Again, we have a statute to protect persons in the
actual prior possession of lands, from being forcibly dis-
turbed. Rev. § 3952.

Defendant was in the actual possession of the square.
The city authorities entered upon this possession, not "in

a peaceable and easy manner, but with force and strong hand." If what the city did, dispossessed the defendant, it was done forcibly, and under such circumstances as would enable him to have the benefit of the statute giving a summary remedy for forcible entry.

Such an entry, wrongful in its nature, is not rewarded by ascribing to it the attributes and giving to it the effect of a lawful entry (3 Black. Com. 174, 179). Besides, the remedy by entry, to which the city resorted, did not become consummate, for the city did not gain and keep any actual possession, it being immediately, or as soon as it was possible to procure the writ, enjoined from taking possession of the square or disturbing the defendant herein in his possession. If a bare entry, not followed by possession thereunder, can, in this State, be regarded, in any case, as an equivalent for an action, we agree with the learned Chief Justice GIBSON (9 Watts, 28, 30, cited *supra*) that the doctrines relating to it are purely technical, and not to be favored. For its effect is, as he justly observes, "subversive of the purpose of the statute of limitations, which is to compel parties to settle their controversies while the evidence of their rights is attainable, and to put a reasonable period to the evils of a contested ownership. By repeated entries within the period of the statute of limitations, a contest might be kept on foot interminably, or until the occupant's proofs had perished with those who could establish them; when, having been deterred from cultivating and improving the land, he might, at last, be left defenseless by the lapse of time, which, instead of having fortified his title, as it ought, would be found to have destroyed it. Such an entry, we are compelled by the terms of the statute to say, is as effective as an action, but we are at liberty, and policy requires us, to hold the plaintiff to strict proof of a formal observance of the ceremony."

VOL. XXIV.—38

If the city had succeeded in getting peaceable possession of the square, it might have avoided the effect of the statute of limitations. The injunction suit did not prevent the city from bringing an action to try the respective rights of the parties. In conclusion, it is deemed proper to add, that the foregoing views in relation to the statute of limitations, and adverse possession, are to be taken in connection with the special facts of this case, and would not necessarily apply to a case where the dedication was *general, unlimited, and for the whole public,* and not *restricted,* or for the primary benefit of the contemplated municipality, and hence under its special control and guardianship; or to a case where the public corporation was ignorant of its rights or those of the public, or that these had been encroached upon, or that a hostile right was being asserted against it; or to a case where the action was by the State, or its public officer, to assert the public rights, and not by the municipal corporation to assert *its* rights. The decree below is

Affirmed.