# BALTIMORE CITY COURT

Filed February 27, 1889.

### BING ET AL.
### VS.
### MAYOR AND CITY COUNCIL ET AL.

*Charles J. Bonaparte* for plaintiffs.

*J. J. Alexander* and *Bernard Carter* for defendants.

■■■■■■■■■■

WRIGHT, J.—

The facts of the case, so far as it is here necessary to consider them, are as follows:

In the year 1782, the General Assembly of Maryland passed "An Act for an addition to Baltimore Town in Baltimore County" (Acts 1782, C. 8, November Session).

In this Act it is recited that whereas Benjamin Rogers, Charles Ridgely and others, being seized and possessed of part of the following tracts of land, to wit, Howard's Timber Neck, Par-

ker's Haven, Kemp's Addition and Gist's Inspection, had petitioned the General Assembly to have said tracts of land laid out into convenient streets, lanes and alleys, it was enacted that the commissioners of Baltimore Town should cause said tracts, or such parts thereof as they may think necessary, to be surveyed and laid out as prayed. By Section 3 it is enacted that the commissioners shall, on or before the first day of September next ensuing, cause a correct survey and plat to be made of the part laid out, and of the streets, lanes and alleys; and that the said plat shall be recorded among the records of said town as soon as conveniently may be thereafter, there to remain as evidence of the boundaries, situation and location of said streets, lanes and alleys, which said streets, lanes and alleys shall be highways, and so deemed and taken to all intents and purposes whatsoever; and *when the same shall be done* the said tracts of land, so laid out, shall be part of Baltimore Town, &c., saving the rights of all persons not mentioned in the Act.

By Section 4 it is enacted that the commissioners shall, on or before the first day of September next ensuing, cause their proceedings to be recorded as an evidence of the boundaries, &c., of said lots, streets and alleys.

By Section 5 the several owners of the land are allowed the exclusive privilege of disposing of the timber, wood and sand contained in or on the streets, lanes and alleys. By the language made use of in this statute, I think it evident that if the provisions of the statute were complied with, the streets, &c., became public highways. The consent of the owners, or the dedication of the land for such streets, &c., would be presumed.

Certain proceedings were taken by said commissioners and one of the tracts of land mentioned, namely: "Howard's Timber Neck," was surveyed and a plat made showing the location of the lots, streets, lanes and alleys. So far as the proceedings in the case before the Court show, nothing more was done in relation to the land so surveyed and laid out, until the 16th day of June, 1807, when Francis Hollingsworth, claiming title under Ridgely, conveyed a portion of the tract to Jacob Gilliard and others in trust for the use and benefit of and to serve as a graveyard for the Africans or people of color in Baltimore, belonging to and in communion with the Methodist Episcopal Church in the United States. This tract of land contained something over two acres, and the description in the deed to Gilliard and others, contains no reference to Hammond street (now known as West street), the right to compensation for the bed of which is here in controversy, neither does said description contain any reference to the plat made by the town commissioners; the only language that could possibly, under any circumstances, be construed into such a reference being that in which it speaks of a line intersecting "the outline of Ridgely's addition to Baltimore Town, thence bounding on the said outline south forty-seven degrees, &c." It is not shown by the evidence how soon after the purchase by these trustees the land began to be used as a graveyard; the evidence does, I think, show very conclusively that it was enclosed and used for that purpose from about 1829 up to 1869 or 1870, and I think we have a right to presume that such use began at the time of purchase, namely, 1807. To the west of this piece of land, there was another graveyard known as "The Potter's Field," the public burying ground of the City of Baltimore. West street, as laid down on the original plat, if graded and paved, would have passed through this negro graveyard and also through Potter's Field.

In August, 1870, William S. Rayner became the purchaser of what was known as the negro graveyard, at a sale made under decree of this Court, and obtained his deed therefor July 26, 1871.

In 1871 the Mayor and City Council passed an ordinance to condemn and open that portion of West street now in controversy. In 1873 an ordinance was passed repealing the ordinance of 1871, and the committee of the City Council to whom the matter was referred, in their report, claimed that the ordinance of 1871 was improperly passed, because the street was already opened by virtue of the Act of 1782, while at the same time they speak of the other portion of West street, which ran through Potter's Field, as having been dedicated by the descriptions in the deeds made by the city to parties who had purchased from the city. Nothing more

was done in relation to this street until September 23rd, 1884, when the Mayor and City Council passed "An ordinance to condemn and open West street from Ridgely street to Burgundy alley." The Commissioners for Opening Streets proceeded to act under this last ordinance and allowed damages to Isidor Rayner, trustee, who had acquired title to the whole tract purchased as aforesaid by William S. Rayner. These proceedings are instituted to enjoin the city from paying the damages so awarded.

There has been some change of parties since the suit was instituted: Henry W. Rogers having been made a party plaintiff and Isidor Rayner a party defendant.

In order to show that the street in controversy had been legally declared a public highway, the plaintiffs produced in evidence the old plat, surveyor's notes and certificate of the commissioners of Baltimore Town. Although the sheet of paper, containing the notes of the surveyor and the certificate of the commissioners, has become detached from the plat, the whole appearance shows, in my opinion, that they constituted one document.

On the plat are the words, "Scale 200 feet in one inch, George Gould Presbury, T. S." On the detached sheet is written: "Baltimore County, ss.:

"I do hereby certify that I have, at the instance of the commissioners of Baltimore Town, carefully surveyed and laid out into lots, streets, lanes and alleys, part of a tract or parcel of land called Howard's Timber Neck, lying and being in Baltimore County, as an addition to Baltimore Town, agreeable to the directions of the said commissioners." Then follows the description of the tract laid out, and the date July 30th, 1783.

Following the surveyor's certificate and notes of survey comes the approval of the plat in these words:

"County of Baltimore, to wit:

"The plat hereto annexed is examined and approved by us, the subscribing commissioners of Baltimore Town, pursuant to powers in us vested by Act of Assembly for that purpose, and the same is hereby declared to be a part of Baltimore Town.

"Witness our hands and seals."

Signed and sealed by John Moale and three others.

The plaintiffs claim that the old plat with the surveyor's notes and the certificates of the commissioners, taken as one document, having been produced from what is at present the proper custody, constitute in law an ancient document of such a character as proves itself. I think this claim of the plaintiffs sustained by authority. It is true that the plat, only a few months before its production in evidence had been sent from the city comptroller's office to the city library, which was the most proper place of custody; that it had not, for at least ten or twelve years, been in this most proper place of custody; but I do not think that the rule in regard to the requirement of proper custody of such ancient document demands that they should be produced from the most proper place.

See Bishop of Meath vs. Marquis of Winchester, 3 Bing., N. C., 200, 202; S. C., 10 Bligh, 462, 464.

The circumstances as to the custody of the document show a considerable degree of carelessness, which in fact had been the case for very many years in regard to the old records relating to Baltimore Town. But even if it had been produced from the custody of the comptroller himself, and offered in evidence, I think it should still be received in evidence as an ancient document.

The plaintiffs then contended that as the plat had been produced from a sufficiently proper custody to allow it to be received as evidence, it being an ancient plat, and the proceedings, by the paper containing the surveyor's notes, shown to have been approved by the Town Commissioners, the Court is bound to presume, after this length of time, that the plat was recorded as required by the statute, that the rule *omnia rite esse acta praesumuntur* must prevail in this case; especially when we take into consideration that there could be found a copy of the plat and the notes at the City Commissioner's office and also (although it is not shown for how long a time), at the city library.

This question has been of considerable difficulty; not as to the general application of the rule, but as to its application to records which should be of such an open public character as land records. I have found some authorities that lead me still to doubt whether the rule should be allowed to prevail in such a case.

Chief Justice Marshall, in Elmendorf vs. Taylor, 10 Wheat, 165, says: "From the year 1813, then, to the present time, the Courts of Kentucky have uniformly decided that a survey *must be presumed to be recorded* at the expiration of three months from its date; and that an entry dependent upon it is entitled to all the notoriety which is possessed by the survey. We must consider the construction as settled finally in the Courts of the State, and that this Court ought to adopt the same rule, *should we even doubt of its correctness.*" And see Brunswick vs. McKean, 4 Maine, R. 511. In our own State the authorities have gone very far in applying the maxim omnia rite, &c. See Keen vs. Whittington, 40 Md. 495. But aside from the long list of authorities cited by the plaintiffs, I have come to the conclusion that I must give full effect to the presumption that all required to be done by the statute of 1782 was done. The State of Maryland has now for a hundred years recognized the regularity and legality of the proceedings of the commissioners under the statute. We must remember that the tract of land laid out on the plat and described in the surveyor's notes was to become a part of Baltimore Town, only after the proceedings were completed by the recording of the plat. Even since the proceedings were taken it is a matter of public notoriety that this tract of land has been continually recognized as a part of Baltimore Town and City, and so recognized by the State in all its different departments. No other statute has been brought to the attention of the Court (and it is believed that no other is in existence), by which this part of the city was ever specially annexed. I do not see how it is possible to presume the proceedings regular in this respect, and deny their validity in relation to their effect in making the streets, contained in the plat, public highways.

We now come to the last question that I think it necessary here to notice, namely, conceding that the portion of West street was legally declared a highway, has there been under the circumstances presented a loss or an abondonment of said street by adverse possession on the part of the defendant Rayner, or of those under whom he claims, or should the city be equitably estopped from contesting his claim?

It is contended by the plaintiffs, as I understood the argument, that as this street was declared a highway by an Act of the General Assembly, there is some greater effect to be given to that declaration, that if the bed of the street had been dedicated by individual owners, or had been opened by ordinance of the Mayor and City Council. I cannot see any force in this contention.

In the first place, if we look at the language of the statute, where it in effect speaks of the Act being occasioned by the petition of the owners of the land, I think we must conclude that the owners agreed to dedicate the land necessary, and that the State accepted that dedication for Baltimore Town. The Act declares that the streets laid down on the plat shall be *highways;* by that declaration the State could have meant nothing more than that they should be highways in Baltimore Town, with all the legal incidents of such highways, and with no other legal incidents than belong to all public highways of that character, full power over which has since been given to the Mayor and City Council. Let us now look for a moment at the particular circumstances of this case, and in doing so I shall state them as I think they are established by a clear preponderance of proof, without commenting in detail on the testimony of the several witnesses. I find that in 1807, the two acres or thereabouts, purchased by William S. Rayner, were sold for the purpose of a graveyard; that the property thus sold for a graveyard was held for that purpose from 1807 up to the time it was purchased by Rayner in 1870, and that it was being so used in 1830, and was then enclosed, and, as before said, I think we have a right to presume such use from the date of its purchase. I think also that there is a clear preponderance of proof that the enclosure continued down to the time of Rayner's purchase or very near to that time. The boards on the fence began to be removed about that time by passing strangers, and there is also evidence that some use was made, after the removal of the fence, of at least a portion of said bed of West street by persons driving wagons and carts.

There is also sufficient evidence to show that the land adjoining on the west was used by the city as the Potter's Field; how long this use con-

tinued is not shown, but there is evidence as to its enclosure. (See Deuchler's testimony, p. 10).

I think that this was the substantial condition of the property at the time of Rayner's purchase. There was nothing, so far as the land was concerned, to call his attention to the fact that West street, through the land purchased by him, was a public highway.

Take now the condition of the records at the time of his purchase. So far as is revealed by the evidence, no one can say where the old plat and the survey were at that time, nor is it now possible to say where the records of that plat and the proceedings were then or are now. It is true, Raynor did not look for them in the proper place; the proper place at that time, under the existing ordinances, would have been in the City Register's office. But had he looked for them there it will hardly be contended that he could have found them, and no copy, authentic or otherwise, could *certainly* have been discovered, except one in the City Commissioner's office, a place where no conveyancer could have been expected to search.

Rayner swears that the land was enclosed, as shown by the plat filed in evidence by the defendants, and although there may be, from the evidence, a difference of opinion as to the time of his first learning of the claim that the street was a highway, I do not think that the evidence at all demands that I should hold that he knew it before his purchase. I stated to counsel at the hearing that I did not think that the testimony taken in regard to what happened after the purchase of Rayner had any relevancy to the questions under consideration. I thought then, as I think now, that the only two questions really before the Court are:

First: Was the street a highway in consequence of the proceedings taken under the Act of 1782? And,

Second: Had the right of the public to that highway been lost, either by abandonment or inconsistent use, or adverse possession? And I only consider the evidence as I think it bears on these two main questions.

Judge Dillon (who became a convert to the doctrine that adverse possession or limitations did not apply to the case of property dedicated to public use within a municipal corporation,

after he had delivered an able opinion to the contrary in Pella vs. Scholte, 24 Iowa 283), in his work on Municipal Corporations, Section 533, in speaking of the corporation, says: "No laches on its part, or on that of its officers, can defeat the right of the public thereto, yet *there may grow up, in consequence, private rights of more persuasive force in the particular cause, than those of the public.* It will perhaps be found that cases will arise of such a character that justice requires that an *equitable estoppel* shall be asserted against the public."

And in County of Piatt vs. Goodall, 97 Ill. 84, the Court says: "On the other hand in all matters involving strictly public rights they (meaning municipal corporations), are not subject to the limitation laws as such. But in the latter class of cases, Courts, occasionally, under special circumstances, which would make it "highly inequitable, or oppressive, to enforce such public rights, interpose by holding the municipality estopped from doing so."

If this principle of equitable estoppel is to be applied to municipal corporations in any case, I think it should be in this. Here the city, after having had a plat made and proceedings taken which are required to be kept among records as evidence of this very plat and these proceedings, allows such records to be lost or mislaid, so that it is next to an impossibility for any purchaser to inform himself as to whether or not he is buying a public highway. Then it permits West street to be enclosed as a graveyard, and I think the testimony shows that the very bed of the street, itself, was used for the purposes of burial. Further than this it goes, and becomes the owner of an adjoining piece of land to that now owned by the defendant, Rayner, and establishes a graveyard there, which we have a right to suppose, from the use made of it, and from Deuchler's testimony, was kept enclosed, and which included the bed of West street just beyond the portion in controversy.

A purchaser could not, with any certainty, inform himself as to the plat and proceedings when engaged in searching his title, and there was nothing in the use made of the land that did not contradict the assumption that he was dealing with an opened street, except in so far as the fact

that the kerb at Ridgely street was turned in at what would be West street; but as it is admitted to be a custom of the city very frequently to so turn in the kerbs, where streets are not opened, this did not, in fact, afford any information. Added to this, the purchaser found the adjoining tract, including the bed of West street, probably enclosed, and certainly used by the city itself, as a receptacle of the dead bodies of its poor. Could there be a more inconsistent use of the bed of a street, and could there be more decided evidences of abandonment by a municipal corporation than are revealed in these proceedings? If there is any force whatever in the language of Judge Dillon and of the other authorities which hold that the principle of equitable estoppel applies in these cases to municipal corporations, I think that the facts here presented should compel a Court of equity to apply that principle. The city, as representing the public in this respect, should be held to be estopped, and I do not think that the defendants have any equitable rights which the city would not be entitled, equally with them, to enforce.

But in Maryland are we bound to look to the principle of equitable estoppel to give relief in cases where it would be "highly inequitable or oppressive to enforce the public rights?" This leads us to the question as to whether or not limitations apply in such cases. Can or can not title be ever acquired in a public highway by adverse possession?

The tract of land, when purchased by Rayner, has, I think, been proved to have been enclosed for about forty years; there is a strong preponderance of evidence of this. (See G. R. Berry's testimony, p. 105; Reiter, p. 95; William Hissey, pp. 74, 75 and 77; John A. Hissey, p. 90; Martinet, p. 6; Emmart, p. 12; Seiss, p. 21; William S. Rayner. Against this see Deuchler, pp. 28 and 30; Gauer, pp. 37 and 38; Bing, pp. 47 and 57). I think we have a right to presume from the nature of the use, that it had been thus enclosed back to 1807, the date of the deed to the trustees. From the nature of that use we must also conclude that it was exclusive and adverse. Here then, if adverse possession can give title to the bed of a street that has once been legally a highway, I think we must

hold that it would do so under the circumstances of this case.

This question has never, so far as I have been able to discover, been decided by our Court of Appeals. There have been most contradictory decisions by the courts of the different States. Some text writers seem to hold one way and some the other. Various expedients have been made use of to prevent the necessity of declaring the law to be that adverse possession or limitations would be effective in these cases, and at the same time provide equitable relief in cases of hardship.

In Rowan's executors vs. Town of Portland, 8 B. Mon., pp. 232, 235, 238, 250, the court held that such adverse possession would bar the right of the public. The same was held in Alves vs. Town of Henderson, 16 B. Mon., p. 172. See also Peckham vs. Henderson, 27 Barb, 212, Commissioners &c. vs. Taylor, 2 Bay, 282.

Varick vs. Corporation of New York, 4 Johns Ch. 53, Beardslee vs. French 7, Conn. 125. In City of Wheeling vs. Campbell, 12 W. Va. R. 36, the Court examined all the conflicting opinions on both sides, and came to the conclusion that the right of the public could be barred by adverse possession. But, as said in that opinion, "While able judges have held the former doctrine," (namely, that the maxim "nullum tempus occurrit regi" is not restricted in its application to sovereignty, but that it applies to municipal corporations, as trustees of the rights of the public), "we have Chancellor Kent, Judges Redfield, Marshall, Moncure, Ranney and other eminent jurists holding to the latter, and Judge Dillon, perhaps no less distinguished than any of the others, on both sides of the question." See Kelly vs. Greenfield, 2 H. & McH. 138. Harrison, C. J., delivering the opinion of the Court. Where it was held that the maxim "nullum tempus occurrit regi" did not apply to the proprietor of the province and where the Court say, "Besides, it is an unjust, injurious and inconvenient rule with respect to the citizens, and as such 'not being expressly given, it ought not to be permitted to operate'."

And see Russell vs. Baker, 1 H. & J. 81, where the Court say that the opinion in Kelly vs. Greenfield, by Harrison, C. J., was to be considered as the deliberate delivered opinion of the general Court.

When I consider the expedients which have been used to do justice in particular cases, and at the same time to avoid putting the relief on the ground of adverse possession or limitations, (see Angell on Highways, Sections 168, 321, 323 and 326), I cannot resist the conclusion that it would have been more conducive to the protection of the rights of the individual, as well as of the public, if the rule had been firmly established, and corporate bodies, as trustees of the public, to whom was entrusted the care of the highways, thus held to a strict accountability for their protection. Although there has been no decision of our Court of Appeals on this question, there has been a decision in one of our City Courts. In the case of Samuel Appold et al., vs. The Mayor and City Council, in the Baltimore City Court, in 1873, the question was squarely before the Court. There was a strip of land bounding on Jones' Falls, which was taken for improvement then in progress. The city agents (the Jones' Falls commissioners), in making assessments for the improvement, claiming that the strip of land was a highway, only allowed nominal damages. The appellants, Samuel Appold and George J. Appold, appealed to the City Court and there they claimed that they had held adverse possession for the requisite period of time to give them a title. Brown, C. J., instructed the jury as follows: "The Court instructs the jury that in respect to the premises, 'A (1), A (2), and A (3),' the appellants are not entitled to any damages unless the jury find they and those under whom they claim, have had an adverse, uninterrupted and exclusive possession of the same as claimants or owners of title for twenty years, and the Court further instructs the jury that there is evidence from which they may find such possession." The case of Appold vs. Mayor and City Council, was cited at the hearing of this cause by the counsel for the defendant, Rayner, he having been of counsel for Appold, and he assured the Court that the only question before the City Court that evoked the instructions, as quoted above, was the question whether adverse possession would give title in the case of land once a highway. The

Court by its instructions held that it would. I also find that in Mayor and City Council vs. White and Shipley, 62 Md. 363, 364, from the instructions asked by the Mayor and City Council in the lower Court, they conceded that adverse possession would have entitled the parties claiming the land to substantial damages where the property was taken for public use, although the same was claimed to have been previously dedicated as a highway. These cases show, I think, the tendency in Maryland to allow adverse possession to bar the right of the public in these cases, and I think it proper and reasonable in this case to follow Judge Brown's decision in Appold vs. Mayor and City Council. If then the public right in this case has been barred or extinguished, has there been such a user by the public as would again make the portion of West street, in controversy, a public highway?

In Cooper vs. Detroit, 42 Mich. 584, it was held that where any part of a highway has been extinguished and turned to other uses, it cannot be renewed without the same methods of dedication or user, which would turn other lands into public ways.

And in Kennedy vs. Mayor, &c., of Cumberland, 65 Md. 521, the Court say: "It has been repeatedly decided by this Court as the law of this State, that where user by prescription is relied on to establish a public highway, there must be an uninterrupted user by the public for at least twenty years, and such user for any less period of time will not suffice."

In this case I cannot find proof of such user by the public; there is, it is true, some evidence, but it is so fully contradicted that I would not feel justified in acting upon it. (See testimony of Bing, p. 62 &c., and contra, testimony of Emmart, p. 10; Seiss, p. 18; Deuchler, p. 27; Gauer, pp. 34, 39, 42; Berry, pp. 101 and 103; Hissey, p. 75; John A. Hissey, p. 91; Reiter, p. 95).

I have concluded, therefore, that West street, between Ridgely street and Burgundy alley, was not a public highway at the time of the passage of the ordinance of 1884, and I will dismiss the bill.